ALLEN DEARBORN *vs.* AMY DEAUSAULT & another.[1]

No. 03-P-405.

Hampden. March 19, 2004. - May 26, 2004.

Present: CYPHER, DREBEN, & TRAINOR, JJ.

*Due Process of Law,* Grandparent visitation. *Minor,* Visitation rights.

In a Probate Court action in which the plaintiff grandfather sought visitation with the defendant mother's children, the judge erred in entering an order granting visitation rights to the grandfather, where the grandfather did not meet his burden of rebutting the presumptive validity of the mother's decision to deny visitation through a showing that the failure to grant visitation would cause the children significant harm by adversely affecting their health, safety, or welfare. [237-238]

CIVIL ACTION commenced in the Hampden Division of the Probate and Family Court Department on July 3, 2002.

The case was heard by *David M. Fuller,* J.

*Raipher D. Pellegrino* for Amy Deausault.

*Heather-Jill K. Williams* for the plaintiff.

DREBEN, J. Claiming that the Probate Court judge, while citing *Blixt* v. *Blixt,* 437 Mass. 649 (2002), cert. denied, 537 U.S. 1189 (2003), failed to follow its precepts, the defendant mother appeals from an order permitting the plaintiff, the children's paternal grandfather, to have visitation rights. See G. L. c. 119, § 39D, set forth in the margin.[2] We conclude that the findings

---

[1]Todd Allen Dearborn.

[2]General Laws c. 119, § 39D, in pertinent part provides:

"If the parents of an unmarried minor child are divorced, . . . or if said unmarried minor child was born out of wedlock whose paternity has been adjudicated by a court of competent jurisdiction or whose father has signed an acknowledgment of paternity, and the parents do not reside together, the grandparents of such minor child may be granted reasonable visitation rights to the minor child during his minority by

of the judge, to which we now turn, do not meet the *Blixt* requirements. Accordingly, the order permitting visitation is reversed.[3]

The mother and the father, who were never married, are the parents of a son, born on October, 26, 1995, and a daughter, born on July 24, 1998.[4] The parents lived together until some time in 1998. After their separation, the father visited with the children until the summer of 2001, when the mother terminated the visits due to the father's substance abuse problems. A judgment of modification dated October 24, 2001, awarded the mother full custody of the children and suspended the father's visitation rights. In July, 2002, he was arrested and incarcerated for possession of hypodermic needles.

The plaintiff (grandfather) and the father's mother[5] had a good relationship with the children and the mother until April, 2002. The plaintiff saw the children regularly "several times per month on average and liked to take the children to local fairs, and on two occasions for camping trips. His contact with the children was a mix of 'grandparenting' and providing sitting for the children while their mother was involved in other activities. The children refer to the plaintiff as 'Papa.' " He "provided emotional support to the children and exposed them to nurturing experiences . . . . The children continue to enjoy an equally strong bond with and emotional support from the mother's parents, who live close to her."

When the father became addicted to drugs, the mother, "quite

the probate and family court department of the trial court upon a written finding that such visitation rights would be in the best interest of the said minor child; provided, however, that such adjudication of paternity or acknowledgment of paternity shall not be required in order to proceed under this section where maternal grandparents are seeking such visitation rights. No such visitation rights shall be granted if said minor child has been adopted by a person other than a stepparent of such child and any visitation rights granted pursuant to this section prior to such adoption of the said minor child shall be terminated upon such adoption without any further action of the court."

[3]Although the mother contests the plaintiff's standing, we agree with the judge's findings and reasoning that permit the grandfather to bring this action.

[4]Paternity suits established that Todd Dearborn was their father.

[5]The grandparents were never married, and although separated at the time the children were born, they maintained amicable relations.

properly," the judge found, sought to limit the children's interaction with him and instructed his parents not to let the children have contact with him. Despite precautions, some contact with the father persisted, and this put his parents in a difficult position "of policing" the mother's imposed ban during their own contact with the children.

The April incident that led to the termination of the grandfather's visits was described by the judge as follows:

> "In early April, 2002, the plaintiff called the mother to alert her that the father was coming over the next morning but that he would return the children beforehand. That conversation resulted in the mother and her current boyfriend calling on the plaintiff late that same evening and obtaining return of the children to her care. She interpreted the pending visit of the father (to the plaintiff's home) as a violation of their understanding."

The judge made additional findings which he stated were relevant to the visitation issue. The "children are doing extremely well, are happy, smart and healthy." The mother is engaged to be married and intends for her fiancé to adopt the children. In agreeing to sign a surrender of rights form (which the mother defectively had notarized), the father, who has never paid child support, sought to preserve the rights for his parents to maintain contact with the children.

Based on his findings, the judge concluded that prior to April, 2002, the grandfather had a "substantial, meaningful relationship with the children," fostered until that time by the mother; that the relationship was similar in some ways to the one the children continue to have with their maternal grandparents; and that "[t]he relationship took on particular importance to the children given their father's exclusion from their lives, and to the plaintiff who felt he must compensate in some ways for the father's absence."

The judge viewed the consequences of the mother's April, 2002 decision "to be out of all proportion to the causes and, the Court infers, may cause the children emotional harm by denying them reasonable access to one who had been a consistent caregiver. To terminate a relationship which she herself

nurtured and encouraged for several years, so arbitrarily is harmful to the children, and may harm their ability to form stable relationships."[6]

Consistent with his conclusions, the judge entered an order permitting the plaintiff one overnight weekend visit each month, provided the father is not present or in contact with the children.

We have recounted the judge's findings and conclusions in some detail because, although they are phrased in the terminology of *Blixt*, we consider them insufficient to show that the grandfather has met his burden of rebutting the presumptive validity of the mother's decision to deny visitation. 437 Mass. at 658. That burden is imposed by due process considerations because of the mother's fundamental liberty interest in child rearing, *id.* at 655, an interest that requires "a legitimate and compelling State interest to justify State action." *Id.* at 656. *Blixt* found this compelling interest in the protection of children from actual or potential harm. *Ibid.* The court imposed the requirement that a grandparent prove "that the failure to grant visitation will cause the child[ren] significant harm by adversely affecting [their] health, safety, or welfare." *Id.* at 658. The court explained:

> "The requirement of significant harm presupposes proof of a showing of a significant preexisting relationship between the grandparent and the child[ren]. In the absence of such a relationship, the grandparent must prove that visitation between grandparent and child[ren] is nevertheless necessary to protect the child[ren] from significant harm."

*Ibid.* While not requiring "de facto parental status on the part of the grandparents," the court noted that the standards it was imposing were "consistent with our cases concerning de facto parents" which "recognize that disruption of [children's] preexisting relationship with a nonbiological parent can be potentially harmful to the child[ren]." *Id.* at 658-659.

---

[6]The judge also noted: "The juxtaposition of restrictions on contact with the paternal relatives placed alongside a long range plan which contemplates an elimination of the father's rights raises concerns as to the genuineness of the mother's motives in limiting contact between the children and the father's family."

In imposing the requirement of harm in the context of "a significant preexisting relationship," the court meant the kind of relationship, such as de facto parents or other relationships of close bonding, where significant harm may be readily inferred from and is inherent in the disruption of that relationship. See *id.* at 658. Where such a close relationship is absent, there must be proof that visitation is "nevertheless necessary to protect the child from significant harm." *Ibid.*

The relationship here, a not uncommon one between grandparent and children, where the grandparent saw the children "several times per month," while meaningful and nurturing, is not the kind of relationship from which significant harm to the children may be inferred from disruption alone. This is especially true where, as indicated earlier, the judge found the children to be "doing extremely well, are happy, smart and healthy."[7]

Since the grandfather did not meet his burden of proof, the order for visitation is reversed. The plaintiff, however, if he considers, through expert testimony or otherwise, that he can show that visitation is necessary to protect the children from significant harm, may move for a new hearing in the Probate Court provided that he does so within thirty days of the rescript.[8]

*So ordered.*

---

[7]In our view of the requirements of *Blixt*, we need not consider the judge's discussion of the motivation or arbitrary action of the mother or the motivation of the grandfather. We doubt, however, that such factors are relevant in most cases to override the parent's decision concerning visitation, and consideration of such factors may also lead to the exposure of the "family's 'dirty linen.' " *Blixt, supra* at 678-679 (Sosman, J., dissenting), quoting from *Hawk* v. *Hawk*, 855 S.W.2d 573, 577 n.2 (Tenn. 1993).

[8]The reason we that we allow the possibility of such an unusual motion is that we hesitate, if there is a real likelihood of evidence of significant harm, to preclude the grandfather from introducing such evidence. We also think it possible that had the judge been aware of the standard that we have articulated, he might have appointed a guardian ad litem to evaluate the relationship between the grandfather and the children.