## MARJORIE SHER *vs.* ROBERT DESMOND.

No. 06-P-1556.

Middlesex. May 9, 2007. - September 27, 2007.

Present: PERRETTA, DUFFLY, & KAFKER, JJ.

*Due Process of Law,* Grandparent visitation. *Grandparent. Interference with Parental Rights. Parent and Child,* Interference with parental rights. *Minor,* Visitation rights. *Child Abuse. Practice, Civil,* Complaint, Affidavit.

Discussion of the law governing grandparent visitation of a minor child [276-277], and of the analytical framework for evaluating a complaint and a supporting affidavit in such a case [277-281].

A Probate and Family Court judge erred in dismissing with prejudice a complaint brought pursuant to G. L. c. 119, § 39D, by the maternal grandmother of a child of parents not living together, seeking visitation with the child after the grandmother's attempts to communicate with him were rebuffed by the child's father (with whom the child was living), where the grandmother's complaint and the affidavit attached to it, which demonstrated that visitation between her and the child might be necessary to protect the child from significant harm from the father, comported with the heightened pleading standard applicable to complaints for grandparent visitation. [281-284]

CIVIL ACTION filed in the Middlesex Division of the Probate and Family Court Department on November 9, 2005.

A motion to dismiss was heard by *Edward F. Donnelly, Jr.,* J.

*Elizabeth M. Clague & Wendy J. Murphy* for the plaintiff.

*Barbara Equen Rodriguez* for the defendant.

DUFFLY, J. The maternal grandmother of a child of parents not living together brought a complaint in the Probate and Family Court pursuant to G. L. c. 119, § 39D,[1] seeking visitation with

---

[1]General Laws c. 119, § 39D, as appearing in St. 1991, c. 292, the so-called grandparent visitation statute, provides, in part: "If the parents of an unmarried minor child are divorced, married but living apart, under a temporary order or judgment of separate support, or if either or both parents are deceased, or if said unmarried minor child was born out of wedlock whose paternity has been adjudicated by a court of competent jurisdiction or whose father has

the child after her attempts to communicate with him were rebuffed by the child's father. The father filed a motion to dismiss and, following a hearing, a Probate Court judge dismissed the grandmother's complaint with prejudice. In this appeal we are asked to decide whether the grandmother's complaint and the affidavit attached to it comport with the heightened pleading standard applicable to complaints for grandparent visitation, as set forth in *Blixt* v. *Blixt*, 437 Mass. 649 (2002), cert. denied, 537 U.S. 1189 (2003) (*Blixt*). We decide that they do, and reverse the judgment of dismissal.

1. *Background.* We begin by reciting certain background facts alleged in the grandmother's complaint and affidavit, the propriety of which are not assailed, at least for purposes of this appeal. The plaintiff, Marjorie Sher (grandmother), has a daughter, Amy Sher (mother), who, sometime prior to March of 1992, began a relationship with the defendant, Robert Desmond (father). The grandmother and other members of the mother's immediate family did not approve of her relationship with the father. In June of 1994, following allegedly abusive, threatening, and harassing telephone calls made to her by the father, the grandmother obtained a restraining order prohibiting him from contacting her or other members of her family (presumably with the exception of the mother). In October, 1994, the father and the mother were married in New Hampshire; no one from the mother's family was invited to the wedding and, in the years following the marriage, there was no contact between the grandmother and the mother.

In June, 2002, the grandmother hired a private investigator to locate the mother in an attempt to effect a reconciliation with her. The investigator learned that the mother had given birth to a son on July 28, 1996. The investigator approached the mother on October 9, 2002, in the parking lot of her place of employment. The mother told the investigator that she did not wish to reconcile with her family. Shortly after speaking to the investigator, the mother disappeared. Upon learning in the spring of 2004 that

signed an acknowledgement of paternity, and the parents do not reside together, the grandparents of such minor child may be granted reasonable visitation rights to the minor child during his minority by the probate and family court department of the trial court upon a written finding that such visitation rights would be in the best interest of the said minor child."

the mother was missing, the grandmother alerted local police, who initiated a formal investigation. Subsequently, the grandmother consulted with a medical professional to seek guidance as to how best to contact the child. She eventually sent two notes to the child by certified mail, both of which were rejected by the father and returned to her.

It is not disputed that the mother no longer resides with the father and the child. As the father asserted in his motion to dismiss, the son "resides with his Father. . . . The Mother left the family home in 2002, and there has been no further contact."

2. *Facts asserted in the affidavit.* On November 9, 2005, the grandmother, now residing in Florida, filed a complaint for grandparent visitation to which she attached an affidavit, supported by exhibits. In addition to the foregoing assertions, the affidavit also contains numerous allegations that the father had committed serious acts of physical violence against the mother over a prolonged period of time and reflects the grandmother's belief that the father may have been responsible for the mother's disappearance. As to the allegations of domestic violence, the grandmother's affidavit relies extensively on letters attached thereto purportedly written by two of the mother's managers at her former place of employment and addressed to a police detective, apparently as part of the investigation into the mother's disappearance.[2] The father argues that the heightened pleading requirement in *Blixt* requires that the verified complaint or affidavit essentially meet a summary judgment standard, setting forth material facts to support the complaint that are based on personal knowledge, and that the grandmother's affidavit largely fails in this respect. Because, as we discuss, *infra*, we decide that the requirements of *Blixt* were met in this case, we consider additional assertions made by the grandmother, including the factual material she attached to her affidavit and from which her assertions, made on information and belief, substantially are drawn. "Accordingly, we accept as true the [grandmother's] allegations and summarize the relevant facts." *Brodeur* v. *American Rexoil Heating Fuel Co.*, 13 Mass. App. Ct. 939, 939 (1982).

[2]Although the letters written by the mother's former managers are not authenticated, the father appears to concede that they were written by the managers.

The first of the mother's managers said he had been trained to recognize victims of domestic violence and observed in the mother the signs and symptoms of a person suffering from "significant and severe physical and emotional abuse." Among other things, the mother frequently was observed with swollen, cut, and bruised hands (which she often tried to hide). Her face, at times, appeared bruised; at other times, she was seen to limp visibly as she walked. The mother had numerous unexplained absences and wore full-length wool sweaters and skirts with heavy, dark stockings in the middle of summer. It was a regular occurrence that the mother was overheard sobbing, pleading, and begging on the telephone to the extent that it disturbed her coworkers. These coworkers divulged to the first manager that there was a "history of abuse concerns" with respect to the mother and that, although she never talked about the father, she "share[d] stories about her son and the joy he brought to her life."

The mother's second manager had known the mother for five years at their place of employment. He related that he personally had observed "horrible conditions" involving the mother, whose life was totally controlled by the father. The mother, who received constant and excessive calls from the father while she was at work, appeared uncomfortable when away from her desk and could not attend meetings without one day's notice. On one occasion when the mother was away from her desk, the father called repeatedly, screaming at a secretary that the mother was not at her desk. The mother left work on that occasion to go home; when she returned she had a bruise on her cheek and a black eye. The mother was frequently absent from work and often would return with injuries (including a severely damaged leg). She was observed with black eyes, broken eye glasses, and hands that were swollen, scratched, and, at times, burned; on one occasion, the mother came to work with a large gash on her head and "the hair around the injury was missing, either shaved or perhaps ripped out." The second manager and others, who often overheard the mother on the telephone "pleading for forgiveness and promising to be a better person," approached the mother with offers to help her but she turned down their offers of assistance and would not state that she had been abused. The second manager reported that one of the mother's cowork-

ers had put brochures discussing battered women in the ladies' room and in office mail slots and counselors were called into the workplace to help staff understand what they could and could not do to assist the mother.[3,4] In the period shortly before the mother abruptly resigned from her job in October, 2002, the mother's "physical appearance had greatly deteriorated." She had lost a significant amount of weight and did not appear to eat regularly when at work; her facial color was gray and her eyes blank. The second manager stated that by the end of her employment, the mother did not discuss her son, whereas she previously had "beam[ed]" when discussing him.

Both managers cite circumstances of the mother's departure from her employment as uncharacteristic and worthy of note.[5] The grandmother also asserts that the father gave differing ac-

---

[3]The grandmother also represented in her affidavit that the mother's neighbors had provided the grandmother with statements that the mother was isolated from people in the community and that the child was not allowed to play with other children.

[4]The second manager also reported that he and the first manager had been told that the mother had left a prior job abruptly when coworkers had confronted her about bruises on her person and had offered her help and shelter.

[5]The first manager related that on October 14, 2002 (soon after the investigator said he had approached the mother), the mother left work early, saying she felt ill; on the next two days she left voice mail messages that she was not well enough to come to work. On October 17, 2002, the father called the main number at the mother's place of employment and was connected to the first manager; the father told him that the mother was not well, that he (the father) was trying to send the manager an electronic mail message (e-mail) and needed his e-mail address. The next day the father called again, and again requested an e-mail address. At the time, these contacts raised questions in the manager's mind as to why the mother had not contacted him herself and why she had not simply provided his direct telephone number and e-mail address to the father. Later that day, the manager received an e-mail from an external e-mail address, utilizing the initial of the father's first name and his last name, to which was attached the mother's letter of resignation. This letter, a copy of which was attached to the manager's affidavit, states, in part: "Recent difficulties I have experienced regarding my personal security and the problematic situation we discussed about the private investigator stalking me at home, and appearing at work, necessitate that I make some life adjustments to restore privacy." It goes on to state that she is "relocating." The manager also received the same letter by post a few days later; though signed, the manager questioned whether it was the mother's signature.

The second manager observed that it was uncharacteristic of the mother to leave work without discussing the status of her projects. He also was of the opinion that the mother's signature on the letter of resignation did not match

counts regarding the circumstances of the mother's departure from the family home.[6]

The father moved to dismiss the grandmother's complaint and to strike her affidavit. In support of his motion he stated, among other things, that the mother left the family house in 2002 and the child resides with him; the mother and the grandmother long had been estranged; the grandmother had had no relationship with the child (and did not know of the child's existence until he was six years old); the father did not wish for the grandmother to visit with the child; the grandmother's affidavit was replete with "hearsay and inadmissible speculation"; and the grandmother had failed to make the showing required by *Blixt*, 437 Mass. at 659, that the failure to grant the grandmother visitation would cause the child significant harm by adversely affecting his health, safety, or welfare. The father filed a memorandum in support of the motion to dismiss, to which he attached a letter dated April 20, 2005, from a case worker at the Department of Social Services (DSS), which recites that, upon investigation, "the Department has found no reasonable cause to support the allegation(s) that your child(ren) has been abused and/or neglected."[7]

After a hearing on the motion to dismiss,[8] the judge dismissed with prejudice the grandmother's complaint without findings or explication.

the signatures on other signed documents. Two of the mother's paychecks were mailed to her home address but never were cashed.

[6]The grandmother alleged that she was informed by law enforcement sources that the police contacted the father after the mother's disappearance and that he stated that she had "left town amicably and of her own volition" and that he had dropped her off at a subway station on October 18, 2002, dressed in business attire. He reportedly gave different statements to others as to where the mother went, including that she left to live with friends; that she moved to Michigan to live with family (the grandmother asserting that the mother has no family there); and that she left in a gray van when he dropped her off at the subway station.

[7]On the belief that the father was about to leave the Commonwealth, the grandmother moved for temporary orders requesting, inter alia, that the father not be allowed to remove the child from Massachusetts without permission of the court. The judge denied the motion but voiced his opinion that the Probate Court retained subject matter jurisdiction over the grandmother's complaint, whether or not the father and the child left the Commonwealth.

[8]We have not been provided with a complete transcript of the hearing.

3. *Discussion.* a. *Governing law.* The due process clause of the Fourteenth Amendment to the United States Constitution protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Blixt*, 437 Mass. at 655-656, citing *Troxel* v. *Granville*, 530 U.S. 57, 66 (2000) (*Troxel*). At the same time, "the State has a compelling interest to protect children from actual or potential harm." *Blixt, supra* at 656. In *Blixt*, the court, operating with the guidance of *Troxel*, our own case law, and other authority, concluded that "[t]o accord with due process, an evaluation of the best interests of the child under [G. L. c. 119, § 39D, see note 1, *supra*,] requires that a parental decision concerning grandparent visitation be given presumptive validity." *Blixt, supra* at 657-658. The court stated:

> "To obtain visitation, the grandparents must rebut the presumption. The burden of proof will lie with them to establish, by a preponderance of the credible evidence, that a decision by the judge to deny visitation is not in the best interests of the child. More specifically, to succeed, the grandparents must allege and prove that the failure to grant visitation will cause the child significant harm by adversely affecting the child's health, safety, or welfare. The requirement of significant harm presupposes proof of a showing of a significant preexisting relationship between the grandparent and the child. In the absence of such a relationship, the grandparent must prove that visitation between grandparent and child is nevertheless necessary to protect the child from significant harm. Imposition of the standards just stated, as explained in specific written findings by the judge, . . . ensures a careful balance between the possibly conflicting rights of parents in securing their parental autonomy, and the best interests of children in avoiding actual harm to their well-being." *Id.* at 658.

Recognizing, as did the plurality of the United States Supreme Court in the *Troxel* case, that "the burden of litigating a domestic relations proceeding can itself be 'so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated,'" *id.* at 665-666, quoting from *Troxel, su-*

*pra* at 75, the court in *Blixt* concluded that traditional notice pleading does not safeguard these concerns and enunciated new and more stringent pleading requirements:

> "Before a parent or parents are called upon to litigate fully a grandparent visitation complaint, with all the attendant stress and expense, the grandparent or grandparents should make an initial showing that satisfies a judge that the burden of proof, set forth above, can be met. To this end, any complaint filed under the statute should be detailed and verified or be accompanied by a detailed and verified affidavit setting out the factual basis relied on by the plaintiffs to justify relief. A complaint not so verified, or one accompanied by an inadequate affidavit, would be subject to dismissal (or summary judgment) on motion by the defendant or defendants." *Blixt, supra* at 666.

See *Daniels* v. *Daniels*, 381 N.J. Super. 286, 296-297 (2005) (noting that the approach adopted in *Blixt* was "reasonable" and "rooted in the same concerns that activated" the New Jersey requirement that "grandparents attempt to amicably resolve visitation disputes before initiating litigation"). See also *Conlogue* v. *Conlogue*, 890 A.2d 691, 697 (Me. 2006).

b. *Analytical framework.* As we have said, as an initial matter, there is disagreement between the parties as to the form of the affidavit required by *Blixt* and the appropriate standards for evaluating the complaint and the affidavit. The grandmother argues that the standards of Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974), have application in the present case and that for purposes of the rule the judge was required to "read indulgently" her complaint, which incorporates her affidavit, and to assume that the facts stated by her, as well as such inferences as may be drawn therefrom in her favor, are true.[9] See *Warner-Lambert Co.* v. *Execuquest Corp.*, 427 Mass. 46, 47 (1998). She argues that "[she] was entitled to proceed under the *Blixt* . . . 'significant harm' provision" and that the judge "was required

---

[9] In evaluating a rule 12(b)(6) motion, a judge may take into account "exhibits attached to the complaint." *Schaer* v. *Brandeis Univ.*, 432 Mass. 474, 477 (2000), quoting from 5A Wright & Miller, Federal Practice and Procedure § 1357, at 299 (1990).

by Massachusetts law to act on behalf of a minor child exposed to severe domestic violence."

In response, the father argues that the heightened pleading requirements outlined in *Blixt* go "further than what is required under . . . [rule] 12(b)(6)." He suggests that application of rule 12(b)(6) standards is incompatible with the affidavit required by *Blixt* and argues that a summary judgment standard should be applied to the affidavit, i.e., the affidavit must be based on personal knowledge, set forth facts as would be admissible in evidence, and show affirmatively that the affiant is competent to testify on the matters stated therein. See Mass.R.Civ.P. 56(e), 365 Mass. 824 (1974); *Madsen* v. *Erwin*, 395 Mass. 715, 719, 721 (1985). See also *Billings* v. *GTFM, LLC*, 449 Mass. 281, 295 (2007).

Although a complaint under the grandparent visitation statute is brought under the rules of civil procedure, the court in *Blixt* set out heightened pleading requirements.[10] The affidavit required by *Blixt* serves a gatekeeping function designed to "minimize the burden placed on a parent or parents to defend against unwarranted actions." *Blixt*, 437 Mass. at 666. The affidavit must necessarily be filed prior to the initiation of any formal postcomplaint discovery. At this initial stage, and where the summary judgment procedure remains otherwise available to a parent, we do not think that *Blixt* requires that the affidavit filed by a grandparent be viewed through the lens of a summary judgment standard. Rather, it is enough that the grandparent states in verified form the specific "factual basis relied on by the plaintiff[ ] to justify relief[,]" *ibid.*, as well as the source or sources of the factual information upon which she relies. This requirement is similar to, and not substantially more burdensome than, "court rules in other areas of the law [see, e.g., Mass.R.Civ.P. 9(b), 365 Mass. 751 (1974), requiring that averments of fraud, mistake, and other special matters be stated with particularity] requiring a plaintiff to assert with specificity in his complaint (or other pleading) allegations which, if proved,

---

[10]The standard Probate Court complaint for grandparent visitation, in effect prior to *Blixt* (but still included as Form CJ-D 105 in the Massachusetts Rules of Court [State], [West 2007]), merely contains the recitation that "the plaintiff(s) allege(s) that it is in the best interest of the minor child(ren) that they be granted visitation with said child(ren)."

would entitle him to prevail." *O'Rourke* v. *Hunter*, 446 Mass. 814, 818 & n.5 (2006), quoting from *Wimberly* v. *Jones*, 26 Mass. App. Ct. 944, 946 (1988) (discussing rule 16 of the Rules of the Probate Court [2006]).[11] See *Equipment & Sys. for Indus., Inc.* v. *Northmeadows Constr. Co.*, 59 Mass. App. Ct. 931, 932 (2003) (when a judge considers a rule 12[b][6] motion to dismiss a complaint alleging fraud and deceit, the requirement that there be an "exceedingly liberal reading" of the complaint must include consideration of the heightened pleading requirements of rule 9[b]). See also *United States ex rel. Karvelas* v. *Melrose-Wakefield Hosp.*, 360 F.3d 220, 226 & n.8 (1st Cir.), cert. denied, 543 U.S. 820 (2004) (under rule 9[b] of Federal Rules of Civil Procedure, "a plaintiff may make allegations of fraud on the basis of personal knowledge or on 'information and belief'; information and belief pleading "is permissible, subject to Rule 9[b]'s particularity requirement and the additional requirement

---

[11]Our analysis finds support in cases interpreting rule 16, which pertains to will contests. Under rule 16(a), each party contesting a will must file an affidavit of objections "stating the specific facts and grounds upon which the objection is based." *O'Rourke* v. *Hunter*, 446 Mass. at 817. Rule 16(b) provides that the proponent of the will "may move to strike [a] contestant's affidavit of objections on the ground that it does not comply with rule 16(a)." *Ibid.* "The purpose of rule 16(a) and (b), as revised in 1987, was 'to help screen out frivolous attacks on wills.' " *Ibid.*, quoting from *Hobbs* v. *Carroll*, 34 Mass. App. Ct. 951, 952 (1993). In *O'Rourke*, *supra* at 817-818, the court stated that a motion to strike an affidavit of objections is similar in some ways to a motion to dismiss a complaint in a civil action under Mass.R.Civ.P. 12(b)(6) — the "judge considers only the affidavit of objections, accepting all of its facts as true . . . ." Continuing, the court quoted with approval our decision in *Wimberly* v. *Jones*, *supra*, where, in considering the standard to be used when evaluating a rule 16 affidavit of objections, we emphasized that rule 16 "requires contestants with standing to state in *verified* form the 'specific facts and ground upon which . . . [the] objection is based,' a requirement which is no more burdensome than court rules in other areas of the law requiring a plaintiff to assert with specificity in his complaint . . . allegations which, if proved, would entitle him to prevail." *O'Rourke*, *supra*, at 818. The court did not find persuasive our statement in *Brogan* v. *Brogan*, 59 Mass. App. Ct. 398, 400 (2003), that "[t]he manner of looking at a rule 16 affidavit resembles more the manner in which a court looks at affidavits in support of or against summary judgment," noting that because motions for summary judgment are now available in will contests, "applying a summary judgment standard to rule 16 affidavits may cause needless confusion." *O'Rourke*, *supra* at 818 n.6. The court stated that "[j]udges ruling on rule 16 motions should ensure only that the contestants have met the standards specified in that rule." *Ibid.*

that pleadings on information and belief set forth the facts on which that belief is founded").

*Blixt* contemplates that a complaint for grandparent visitation will be based on one of two showings: (1) "a showing of a significant preexisting relationship between the grandparent and the child"; or (2) "[i]n the absence of such a relationship . . . that visitation between grandparent and child is nevertheless necessary to protect the child from significant harm." *Blixt, supra* at 658. It is, additionally, the very premise of the *Blixt* decision creating a heightened pleading standard, that the child's parent is fit. See *id.* at 658 n.14 ("The presumption of valid parental decision-making necessarily requires application of a presumption that the parent is fit"). See also *Troxel*, 530 U.S. at 68-69 ("so long as a parent adequately cares for his or her children [*i.e.*, is fit], there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children").[12]

The question of the existence of a pre-existing relationship so significant to the child's well-being as to permit the case to go forward was at stake in *Blixt*, and represents the more common

[12]Our statutes provide that "[a] probate and family court's finding, by a preponderance of the evidence, that a pattern or serious incident of abuse has occurred shall create a rebuttable presumption that it is not in the best interests of the child to be placed in sole custody, shared legal custody or shared physical custody with the abusive parent." G. L. c. 208, § 31A, inserted by St. 1998, c. 179, § 3; G. L. c. 209, § 38, inserted by St. 1998, c. 179, § 4; G. L. c. 209C, § 10, inserted by St. 1998, c. 179, § 6. "Creating a presumption that custody in a parent is not in the best interests of a child . . . also implicates the child's right to be free from abusive or neglectful behavior." *Opinion of the Justices*, 427 Mass. 1201, 1205-1206 (1998).

So strong do we view this interest of a child that we have affirmed decisions terminating parental rights on findings of parental unfitness based on evidence that a mother did not stay away from a partner who physically abused her, even when the child was not directly the recipient of physical abuse. See, e.g., *Petition of Catholic Charitable Bureau of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption*, 395 Mass. 180, 186 (1985); *Adoption of Ramon*, 41 Mass. App. Ct. 709, 717 (1996). We also have said that it is relevant to deciding a father's fitness to parent that he abused the mother, though not the child. See *Care & Protection of Lillith*, 61 Mass. App. Ct. 132, 139-142 (2004). Compare G. L. c. 208, § 28 (limiting visitation of child with parent who has been convicted of murder in the first degree of other parent); G. L. c. 209, § 37 (same); G. L. c. 209C, § 3 (same).

case in which a complaint for grandparent visitation will arise. See *Dearborn* v. *Deausault,* 61 Mass. App. Ct. 234, 238 (2004). Facts pertaining to such a relationship normally will be within the grandparent's own knowledge, see *Daniels* v. *Daniels,* 381 N.J. Super. at 294-295, and a complaint based on averments that do not establish a sufficiently close relationship is subject to dismissal as matter of law.[13]

Under the second basis for a complaint seeking grandparent visitation, allegations that a child will suffer significant harm arising, not from the disruption of a pre-existing relationship with the grandparent but from some other source (including, for example, domestic violence, as was alleged here), a grandparent may not have personal knowledge of certain of the factual allegations stated in her affidavit. Moreover, it may be impractical for the grandparent to obtain an affidavit from the source of the averment (such as where, for example, the source is the child with whom the grandparent seeks visitation).

Thus, a grandparent's complaint seeking visitation under this second basis, will survive dismissal under rule 12(b)(6) — while remaining subject to summary judgment — where the *Blixt* affidavit contains averments of significant harm that are (1) facially sufficient to rebut the presumption of parental fitness; (2) based on information and belief; and (3) made with particularity and indicating the source of the information.[14]

c. *Application of heightened rule 12(b)(6) standard.* In the circumstances, we will affirm the judgment of dismissal "only

---

[13]Contrast *Dearborn* v. *Deausault,* 61 Mass. App. Ct. at 238 & n.8 (noting that grandparent might through expert testimony seek to show that visitation is necessary to protect child from significant harm).

[14]As a threshold matter, we comment briefly on a procedural aspect of the case not addressed by the parties. As we have stated, the father filed a memorandum in support of his motion to dismiss, to which he attached a letter written by a case worker from the Department of Social Services. In the absence of notice to the grandmother that the judge intended to treat the motion to dismiss as one for summary judgment, and the opportunity for the grandmother to present further material, we do not view submission of the DSS letter as properly effecting a conversion of the motion to dismiss to one for summary judgment. See *Stop & Shop Cos.* v. *Fisher,* 387 Mass. 889, 892-893 (1983); *Gomes* v. *Metropolitan Prop. & Cas. Ins. Co.,* 45 Mass. App. Ct. 27, 32 (1998).

At the hearing on the motion to dismiss, counsel for the grandmother voiced her understanding that the motion was to be decided under a "motion to dismiss standard." Furthermore, in the father's supplemental memorandum

if 'it appear[s] to a certainty that [the grandmother was] entitled
to no relief under any state of facts which could be proved in
support of the claim.' " *Stop & Shop Cos.* v. *Fisher*, 387 Mass.
889, 893 (1983), quoting from Reporters' Notes to Mass.R.
Civ.P. 12, Mass. Ann. Laws, Rules of Civil and Appellate
Procedure at 211 (1982). See *Equipment & Sys. for Indus., Inc.*
v. *Northmeadows Constr. Co.*, 59 Mass. App. Ct. at 931. From
the facts alleged in the grandmother's complaint as well as her
affidavit and supporting materials attached thereto, it may be
inferred, at the very least, that the mother was the victim of
severe physical abuse at the hands of the father over a prolonged
period of time, and that, due to the highly visible nature of the
injuries suffered by her, the child was a witness to the effects of
the abuse, if not the abuse itself. Moreover, based on the allega-
tions, no one in the mother's family is permitted to have contact
with the child and he has been isolated by his father from
members of the community, thus making it less likely that any
harm the child suffers will come to light in the absence of
visitation with the grandmother.

It cannot be gainsaid that a child who has been "either the
victim or the spectator of [domestic] abuse suffers a distinctly
grievous kind of harm." *Custody of Vaughn*, 422 Mass. 590,
595 (1996). See *Opinion of the Justices*, 427 Mass. 1201, 1203
(1998) ("growing national awareness that children who witness
or experience domestic violence suffer deep and profound
harms"); *Care & Protection of Lillith*, 61 Mass. App. Ct. 132,
141 (2004) ("witnessing domestic violence is itself a 'grievous'
harm"); *Mitchell* v. *Mitchell*, 62 Mass. App. Ct. 769, 772-773
(2005) (preserving fundamental human right to be protected
from devastating impact of domestic violence is Common-
wealth's public policy, as reflected in many statutes). It is the

---

in support of his motion to dismiss, he argued that the grandmother's complaint
"should be dismissed for failure to state a claim upon which relief can be
granted. M.R.C.P. 12(b)(6)." The grant of the motion to dismiss and the issu-
ance of the judgment of dismissal suggest that the judge did not treat the
father's motion as one for summary judgment.

School records of the child attached to the supplemental memorandum could
not have been considered by the judge in connection with the motion to dismiss
because it was filed the day *after* the motion to dismiss was allowed and the
judgment of dismissal issued, nor could the records serve as a basis to convert
the matter into one for summary judgment, absent notice.

intent of the grandparent visitation statute "to safeguard children." *Blixt*, 437 Mass. at 663. Our decisions recognize that a child exposed to serious domestic violence in the home *has* suffered significant harm. See *Opinion of the Justices*, *supra* at 1208 & n.5 (numerous articles addressing the effects of family violence on children support conclusions that "batterers are more likely to abuse their children than the average parent" and that "children exposed to domestic violence suffer both behavioral and developmental harm").[15]

Visitation with a grandparent, even one who has no significant pre-existing relationship with the child, may be necessary in certain circumstances to protect the child from further significant harm. See *Blixt*, 437 Mass. at 658 (requiring, where no established relationship, that grandparent prove that visitation "is nevertheless necessary to protect the child from significant harm"). Precisely how such visitation will prevent the harm will depend on the circumstances.[16] Where, as here, the allegations indicate the possibility of serious physical abuse of an ongoing nature and a pattern of isolating the child from family and neighbors, regular contact with a grandparent may be necessary to ensure that the child himself is not abused or exposed to new domestic violence, either by inhibiting parental abuse or by permitting a grandparent to observe abuse that has occurred. Such visitation may provide a source of nurturing and love necessary where a parent has disappeared. Indeed, if in future proceedings it is established that the mother in fact suffered the alleged severe and long-term domestic violence at the hands of the father, visitation also may permit monitoring of the child's emotional stability and development in light of his exposure to the earlier

---

[15]Domestic violence is a factor that has been recognized in other jurisdictions in the context of grandparent visitation. See, e.g., *DeRose* v. *DeRose*, 469 Mich. 320, 339 & n.6 (2003) (Weaver, J., concurring) (factors applicable to grandparent visitation include domestic violence, "regardless of whether the violence was directed against or witnessed by the child"). But see *Craven* v. *McCrillis*, 178 Vt. 476, 478 (2005) (grandmother failed to connect how alleged past physical abuse of ex-wife adversely affected child's present health, safety, and welfare).

[16]A grandparent could establish the necessity of visitation "through expert testimony or otherwise," *Dearborn* v. *Deausault*, 61 Mass. App. Ct. at 238; a guardian ad litem also could be appointed, *id.* at 238 n.8.

violence, and development of a relationship with the grandparent, necessary to the child's well-being.

The grandmother's allegations rebut the presumption of the father's fitness, at the very least, to decide alone whether to permit visitation. See *Polasek* v. *Omura*, 332 Mont. 157, 162 (2006) (in context of grandparent visitation, if parent is unfit, no presumption arises and parent's wishes are due no deference). Here, on the facts alleged, and taking into consideration the heightened pleading requirements in grandparent visitation cases, the grandmother's complaint and affidavit make the necessary showing that visitation between her and the child may be necessary to protect the child from significant harm. It was, therefore, error to allow the motion to dismiss.[17]

4. *Conclusion.* The judgment of dismissal is reversed and the matter is remanded to the Probate and Family Court Department for further proceedings consistent with this opinion.

*So ordered.*

---

[17]In view of the decision we reach, we do not consider other issues raised by the appeal.