J.F. *vs.* J.F.

No. 06-P-2011.

Hampden. March 11, 2008. - October 9, 2008.

Present: Lenk, Gelinas, & Fecteau, JJ.[1]

*Practice, Civil,* Summary judgment. *Minor,* Custody. *Divorce and Separation,* Child custody, Modification of judgment.

Discussion of the legal principles governing a probate judge's modification of a judgment awarding sole physical custody of a child to a party, and commentary on the importance of using great caution in deciding whether summary judgment is appropriate in a custody modification proceeding. [789-792]

In proceedings arising from a father's complaint for modification of a judgment awarding sole physical custody of a child to the mother, the probate judge erred in granting summary judgment in favor of the mother, where, viewing the evidence in the light most favorable to the father, it could reasonably be inferred that the child's emotional needs were not being adequately met in the mother's household subsequent to the divorce. [792-797]

Complaint for divorce filed in the Hampden Division of the Probate and Family Court Department on August 31, 2001.

A complaint for modification, filed on July 11, 2004, was heard by *David G. Sacks,* J., on a motion for summary judgment.

*James M. Smith* for the father.

*Thomas A. Kenefick, III,* for the mother.

Gelinas, J. Less than five months after the entry of a judgment of divorce nisi that incorporated an agreement of the parties providing that the defendant (mother) was to have physical custody of the parties' two minor children, Molly and Tom,[2] the plaintiff (father) filed a complaint for modification alleging

---

[1] Justice Gelinas participated in the deliberation on this case and authored this opinion prior to his retirement.

[2] We use pseudonyms for the children.

various changes in circumstances and requesting (1) that the divorce judgment be modified by transferring to him physical custody of Tom and (2) that Tom be allowed to relocate to the State of Connecticut where the father resided. The mother responded with a motion for summary judgment, which was allowed by the judge. As we agree with the father that summary judgment should not have entered for the mother, we vacate the judgment dismissing the father's complaint for modification and remand the matter to the Probate and Family Court for further proceedings consistent with this opinion.

1. *Background.* The parties were married in 1984 and were divorced by a judgment of divorce nisi dated January 30, 2004. During the divorce proceedings the parties executed a separation agreement, which provided that they would share legal custody of the minor children and that the mother would have sole physical custody of the children.[3] The judgment of divorce nisi appears to have incorporated that provision of the agreement.

On or about June 11, 2004, the father filed a complaint for modification alleging, as changes in circumstances, that the mother was neglecting, abusing, or otherwise ignoring Tom, that Tom had "become extremely lonely and depressed" as a result of the lack of attention, and that Tom, on numerous occasions since the divorce, had expressed his desire to live with the father.[4] The father requested that the court modify the divorce judgment so as to award him physical custody, or "at least shared physical custody," of Tom and that Tom be allowed to relocate to Connecticut. Thereafter, the judge appointed counsel for the children and, on the father's motion, a guardian ad litem to investigate and make findings concerning the physical custody of the minor children and a visitation schedule for the children.

2. *The guardian ad litem's reports.* The guardian ad litem, Linda Cavallero, Ph.D.,[5] submitted a thirty-three page initial report in November, 2005, and a supplemental report in Febru-

---

[3]Molly was born on January 18, 1990; Tom, on September 14, 1994.

[4]Originally, the father, through his complaint for modification, also sought physical custody of Molly. He did not pursue that claim.

[5]Doctor Cavallero represents in the reports that she is an associate professor of clinical psychiatry and the director of the University of Massachusetts family court clinic.

ary, 2006. Both reports are included in their entirety in the summary judgment materials and are relied on by the parties. Doctor Cavallero interviewed both the parties and the children on multiple occasions. In addition, she spoke with numerous "collateral contacts," including Helena Friedman, the children's (former) attorney; Peter G. Grey, Ph.D, a psychological consultant retained by the parties to help them "work out" an agreement on child issues; the children's former and present nannies; the children's pediatrician; and a number of educators at the children's schools. Doctor Cavallero also conducted psychological testing on the parties and reviewed dozens of "records," including a letter of Dr. Grey to the parties dated October 21, 2004 (discussed *infra*).

Doctor Cavallero indicated that the parties are well educated successful professionals. Their divorce was a bitter one. The father reported to Dr. Cavallero that since the divorce Tom has repeatedly requested to live with him. The father also voiced his concern that the mother paid little attention to Tom and that Tom was "lonely" at her home. Tom reported to Dr. Cavallero that his mother leaves for work in the morning before he leaves for school; the nanny drops him off at the bus stop and picks him up later. Continuing, Tom stated that although he sometimes "do[es] things" with his mother in the evening, they really do not "do much." Tom acknowledged that, on occasion, he goes for a bicycle ride or plays golf with his mother. Tom indicated that he would like to try living with his father and "thinks" that his mother told him it would be all right with her. Tom stated that the "bad side" of such an arrangement would be that he would not see his mother as much. Tom reported that he was not really close to his sister. School personnel reported to Dr. Cavallero that Tom was doing well in school and was a "pleasure" to have in class. The children's current nanny, a college student and friend of Molly, "expressed no concern about the children."

Helena Friedman, who was involved with the family as counsel for the children between August, 2004, and the spring of 2005, reported that Tom had told her that he does a lot of activities with his father and that with his mother he goes to the movies, shops, plays golf, and has friends over. Tom informed Friedman that he wanted to live with his father and included within

his reasons that the "mother spent a lot of time going with [Molly] to the barn for horseback riding [counsel stated that Molly was involved with horseback riding on a daily basis; she apparently owns or has regular access to a horse], and that he had more fun at his father's house."

Doctor Peter Grey, who met with the parties and the children (on two occasions) to better understand the family situation, reported to the guardian ad litem that both parents are "very busy and stated that the children were raised by whoever was with them." He described Molly as "indulged" and "something of a 'manipulator' " and stated that the mother's household "seemed to be set up around [Molly's] needs more than [Tom's]." He noted, for example, that when Molly went for riding lessons, Tom had to go along and spent his afternoon in the car rather than playing with peers. Doctor Grey reported that Tom "was not 'the prize child' at least by the mother."

A nanny who had cared for the children for seven years (until the summer of 2002), but who had subsequently been given some access to the children by the father, expressed concern that Tom "does not seem happy and that other people who have known him for a long time report that he looks 'sad.' "

Doctor Cavallero stated in her conclusions in her initial report that, in her opinion, "both parents are basically capable and love their children. [The mother's] strengths as a parent are her hard work and her commitment to her children." She noted, however, that the father appears to have a better appreciation of Tom's needs and experience, and that his "strengths are his empathy for both children, especially [Tom], and his willingness to adapt his current schedule to meet their needs." In contrast, the mother "tends to view the situation from her perspective" and in a "self-serving manner." Doctor Cavallero stated that the father "*correctly* notes that [Tom] is somewhat lonely in the mother's household, that his needs are not the priority and that [Tom] frequently comes second to the needs of his sister and his mother" (emphasis supplied). Doctor Cavallero also stated that Tom had consistently expressed his preference to live with his father to numerous individuals (including Dr. Grey, attorney Friedman, his parents, and the guardian ad litem) and had stated as reasons that he had a longing to spend more time with his father, that he had

been unable to spend consecutive days with him, and that he enjoyed the activities that he engaged in with his father. Doctor Cavallero opined and recommended that "given [Tom's] long standing and developmentally appropriate request to live with his father and his apparently well-reasoned rationale, [Tom] should be allowed to move to the primary custody of his father with an access schedule with his mother comparable to what he has at the present with his father."

Pursuant to an order of the court directing the guardian ad litem to speak with the child's current therapist, Dr. Cavallero contacted Anthony Wolf, Ph.D, who had been seeing Tom since some time after November 10, 2004, and submitted a supplemental report. Doctor Wolf reported on February 18, 2006, that at the time therapy began, Tom was suffering from stomach aches that most likely were related to stress. Indeed, both parents had expressed their concern that Tom was in the middle of their contentious disagreements concerning the divorce and parenting plan. Continuing, Dr. Wolf reported that Tom's stomach aches had substantially diminished and that he appears to be a well-functioning child who has a good relationship with his mother and enjoys the time he spends with his father. He described Tom as "generally upbeat" and did not think that he was depressed. Doctor Wolf acknowledged that he generally hears about "issues" from the mother, not from Tom, but stated that Tom is "pretty open" if questions are asked. Doctor Wolf also stated that at an earlier point in time when he discussed with Tom the possibility of living with his father, Tom had expressed an interest in spending more time with his father, although Dr. Wolf was not sure that Tom had thought through the issues thoroughly. Doctor Cavallero declined to modify her conclusions or recommendations as stated in her principal report subsequent to her conversation with Dr. Wolf.

3. *The motion for summary judgment and opposition thereto.* On May 31, 2006, the mother filed a motion for summary judgment and an affidavit of undisputed facts (supported by numerous papers, including excerpts from the guardian ad litem's report, the guardian ad litem's supplemental report, excerpts from deposition transcripts, and school records). See Mass.R.Dom.Rel.P. 56(a) (1997). The mother averred in her affidavit that she did

"not believe that anything [had] changed since the date of the divorce . . . that would warrant a change in custody." She stated, among other things, that Tom was a well behaved and well adjusted child with whom she participated in many activities, including golf and bicycle riding. She also stated that Tom participates in various sports, including karate, baseball, and swimming (activities which, she states, she attends), that he is in a stable environment,[6] and that he is doing well in school. Pointing to Dr. Cavallero's reports, the mother stated that at no time did the guardian ad litem find (nor did Dr. Grey, Dr. Wolf, or attorney Friedman report) that she had neglected or abused Tom or that Tom was depressed. To the contrary, the mother stated that Dr. Cavallero had found that she (the mother) was capable and loved her children, and that Dr. Wolf had concluded that Tom was not depressed and was generally upbeat. The mother also stated that the father had moved on several occasions within Connecticut, that a subsequent marriage of the father had been annulled, and that she did not believe that the father could provide a stable home for Tom. The mother indicated that Tom had never been away from home for more than two weeks and that a dramatic change in his living conditions (e.g., a new home, a new school, and new classmates) could be detrimental to him.

Thereafter, pursuant to Mass.R.Dom.Rel.P. 56(b) (2000), the father filed an opposition to the mother's motion together with an affidavit of disputed facts (supported by numerous papers) (rule 56[b] affidavit) and an affidavit of undisputed facts. A central thrust of the father's rule 56(b) affidavit is that the mother had misrepresented Dr. Cavallero's report and that the guardian ad litem did, in fact, find that Tom was lonely and neglected in the mother's household and that his needs were not being met by the mother. The father also attached as an exhibit to his rule 56(b) affidavit a letter from Dr. Grey to the parties dated October 21, 2004.[7] Doctor Grey states in his letter that Molly (who, Dr. Grey noted, has an active social life) was heavily invested in her equestrian interests and, in a very adolescent way, "is aware that

---

[6]The mother has remarried since the divorce.

[7]The father filed an affidavit of notice pursuant to G. L. c. 233, § 79G, of his intention to offer the letter into evidence. The judge indicated in his memorandum of decision that he had reviewed the letter.

[Tom] exists but doesn't pay much attention to him." Continuing, Dr. Grey stated:

> "Ten-year-old [Tom] presents a more complex picture and I have explained to both of you that I am concerned about his being more than just unhappy. He is dismayed about your arguing and suggests that the attention paid to [Molly] shortchanges him. Most importantly he is torn by the notion that his feelings about where he might like to live would wound or hurt one of you. Regardless of the decision (for which the adults in this matter need to be responsible) I believe that all of the parties need to work together so that he is not emotionally harmed. In my opinion, [Tom] is a child at risk to become clinically depressed."

The father also averred that Tom had missed all or part of forty-three days of school in the last one and one-half years and that he was no longer involved in many sporting activities (which, he stated, the mother seldom attended). In addition, the father stated that because he had made new hires in his business, he had a "great deal more flexibility" to be with Tom. The father stated in his rule 56(b) affidavit that Tom is not given attention by his mother, that his needs are not being met, and that he continues to be a "second class citizen to his sister who" is indulged by the mother. Continuing, the father stated that Tom has requested repeatedly that the father "continue [the modification] process because he does not want to live in his mother's household."

4. *The memorandum of decision and judgment.* After a hearing on the motion, the judge issued a memorandum of decision in which he found that "while there are many allegations, assertions and charges made, there is an absence of genuine issues of material fact in dispute."[8] The judge noted, for example, that "some of the assertions predate the entry of the divorce" and "[t]hat a

---

[8]Although the judge stated in his memorandum of decision that the ultimate question in the case is whether there are genuine issues of material fact in dispute regarding the material and substantial change in circumstances alleged to have taken place between January 30, 2004, and June 10, 2004, his statements concerning the materials fully reviewed by him suggest that he considered evidence subsequent to June 10, 2004. In the summary judgment materials, and on the appeal, both parties also rely on evidence subsequent to that date.

ten year old boy may have 'reflected' that he wants to live with another parent is not necessarily surprising or unusual but does not rise to the level of the required change of circumstances even if proven." Continuing, the judge stated that "[i]n terms of genuine issues of material fact to be tried regarding the allegations of [the mother's] ignoring, neglecting and abusing the child, they do not exist." The judge stated that the father's "offers of proof simply cannot show that [the mother] is neglecting [Tom], even when considered in a light most favorable to [the father]. In place of evidence from which a trier of fact can infer that [Tom] is neglected, [the father] has produced conclusory statements and allegations by him not grounded on [the father's] personal knowledge." Based on the foregoing, the judge determined that the mother was entitled to summary judgment and dismissed the father's complaint for modification.[9]

5. *The governing legal principles.* Rule 56(a) of the Rules of Domestic Relations Procedure provides that "[a] party may move for summary judgment subsequent to the commencement of any proceeding under these rules in actions for modification and actions to modify or enforce a foreign judgment." A judge shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and responses to requests for admission under [Mass.R.Dom.Rel.P.] 36, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Mass.R.Dom.Rel.P. 56(h) (2003). The moving party, here the mother, "must 'affirmatively demonstrat[e] that there is no genuine issue of material fact on every relevant issue, even if [she] would have no burden on an issue if the case were to go to trial.' " *Department of Rev.* v. *Mason M.,* 439 Mass. 665, 674 (2003), quoting from *Pederson* v. *Time, Inc.,* 404 Mass. 14, 17 (1989). See *Kernan* v. *Morse,* 69 Mass. App. Ct. 378, 382 (2007). See also *Jupin* v. *Kask,* 447 Mass. 141, 146 (2006) (party moving for summary judgment "may prevail by showing that the nonmoving party has no reasonable expectation of proving an essential element of his case at trial"). All eviden-

---

[9]In view of the decision he reached, the judge determined that the father's request for "relocation relief [was] moot as [the father does] not have any form of physical custody."

tiary inferences are to be resolved in favor of the party opposing the motion for summary judgment. *Nunez* v. *Carrabba's Italian Grill, Inc.*, 448 Mass. 170, 174 (2007). "In deciding a motion for summary judgment, a court does not resolve issues of material fact, assess credibility, or weigh evidence." *Kernan* v. *Morse*, 69 Mass. App. Ct. at 382.

While an original judgment awarding sole physical custody of a child to a party is presumed to have been right, *Hersey* v. *Hersey*, 271 Mass. 545, 554 (1930); *Rosenthal* v. *Maney*, 51 Mass. App. Ct. 257, 261 (2001), it is not immune from modification. General Laws c. 208, § 28, provides that a judge of the Probate and Family Court may modify an earlier divorce judgment concerning the custody of a minor child on finding "that a material and substantial change in the circumstances of the parties has occurred and the judgment of modification is necessary in the best interests of the children." See *Ardizoni* v. *Raymond*, 40 Mass. App. Ct. 734, 738 (1996) (in determining modifications of custody awards based on changed circumstances, "the guiding principle always has been the best interests of the children"). An award of custody will not be sustained "unless all relevant factors in determining the best interests of the child have been weighed." *Rosenberg* v. *Merida*, 428 Mass. 182, 191 (1998), quoting from *Bouchard* v. *Bouchard*, 12 Mass. App. Ct. 899, 899 (1981).[10] As the present case appears to raise for the first time before an appellate court of the Commonwealth the propriety of a grant of summary judgment in the child custody context,[11] we comment initially on the use of summary judgment in custody modification proceedings.

We perceive nothing in the language of Mass.R.Dom.Rel.P. 56,[12] or in the nature of child custody in general, cf. *Houston* v.

---

[10]In *Ardizoni* v. *Raymond*, 40 Mass. App. Ct. at 738, we noted that when determining the best interests of children a judge may consider "the widest range of permissible evidence, including the reports and testimony of [the guardian ad litem], evidence of the history of the relationship between the child and each parent, evidence of each parent's home environment," and any expression of preference by a child. See *Adoption of Hugo*, 428 Mass. 219, 231 n.21 (1998), cert. denied sub nom. *Hugo P.* v. *George P.*, 526 U.S. 1034 (1999).

[11]We decide this day a second case in which summary judgment was entered for the mother on the father's complaint for modification of visitation. *R.S.* v. *M.P.*, *post* 798 (2008).

[12]We recognize that certain aspects of custody proceedings do not fit readily

*Houston,* 64 Mass. App. Ct. 529, 534-535 (2005) (child custody "holds a peculiar place in our jurisprudence and implicates a 'societal interest' "), that would necessarily preclude the use of summary judgment in child custody modification actions.[13] The parties in the present case do not contend otherwise. That said, we think it is important that a judge proceed with great caution in deciding whether summary judgment is appropriate in a custody modification proceeding. Both the question whether there has been a material change in circumstances, and, if so, the question whether modification is necessary in the best interests of the children, will most often involve the resolution of disputed issues of material fact or the weighing of evidence. Such considerations, as we have stated, would render inappropriate summary judgment. With regard to the former question, we recognize that in the initial instance the judge must review the factual allegations to determine whether they involve facts that are material, see *Attorney Gen.* v. *Bailey,* 386 Mass. 367, 370, cert. denied, 459 U.S. 970 (1982), quoting from *H & M Cake Box, Inc.* v. *Bakery & Confectionery Workers, Intl. Union, Local 45,* 454 F.2d 716, 719 (1st Cir. 1972) ("court should only 'determine whether a genuine issue of material fact exist[s]' "); disputed facts are material only if they have a bearing on the outcome of the case. *Jupin* v. *Kask,* 447 Mass. at 145-146. Once the judge determines that there are facts bearing on the outcome of a custodial contest that are in dispute, summary judgment does not lie. See *Brush* v. *Brush,* 414 So. 2d 37, 38 (Fla. App. 1982) ("We caution that summary judg-

within the traditional summary judgment framework. For example, the report of a guardian ad litem, which is generally admissible in evidence in custody proceedings as long as the guardian ad litem is available to testify at trial and the source of the material is sufficiently identified, see *Jones* v. *Jones,* 349 Mass. 259, 264 (1965); *Gilmore* v. *Gilmore,* 369 Mass. 598, 604-605 (1976); *Adoption of Georgia,* 433 Mass. 62, 69 (2000), will often contain hearsay information, including multiple level hearsay. See *Adoption of Georgia,* 433 Mass. at 68-69. In the instant matter, both parties rely upon the statements of individuals reporting to the guardian ad litem and the mother has accepted as true the numerous "facts" stated in her brief for purposes of summary judgment. See and compare *Adoption of Sean,* 36 Mass. App. Ct. 261, 263-265 (1994).

[13]At least one appellate court has held that because each of the factors identified in its State code with respect to the modification of custody requires a factual determination, summary judgment is never appropriate in a child custody determination. *Hemingway* v. *Sandoe,* 676 N.E.2d 368, 370-371 (Ind. App. 1997).

ments should be granted sparingly upon petitions for modification of custody because of the inherent factual disputes prevalent in such proceedings").

Furthermore, in most cases, once a determination is made that there has been a material change in circumstances, summary judgment will be inappropriate. This is especially so in light of the "widest range of permissible evidence" that the judge may consider in determining a child's best interests. *Ardizoni* v. *Raymond*, 40 Mass. App. Ct. at 738. See *Adoption of Irene*, 54 Mass. App. Ct. 613, 617 (2002) ("[w]here the objective is a . . . child's best interests, factual determinations are necessarily involved").[14] Cf. *Goulart* v. *Canton Hous. Authy.*, 57 Mass. App. Ct. 440, 441 (2003) ("Ordinarily, summary judgment is not an appropriate means to resolve negligence cases, because usually the question of negligence is one of fact"). Each case must be carefully analyzed and any "[d]oubts as to the existence of a genuine issue of material fact are to be resolved against the party moving for summary judgment." *Allmerica Fin. Corp.* v. *Certain Underwriters at Lloyd's, London*, 449 Mass. 621, 628 (2007).

6. *Factual issues.* The father argues that the judge erred in determining that no genuine issues of material fact exist regarding his allegations that the mother neglected Tom and further erred in determining that the evidence, viewed in the light most favorable to him, cannot show that the mother was neglecting Tom. We agree with the father that summary judgment should not have entered for the mother.

At the outset, we note that the mother, in arguing that the father cannot demonstrate, and there is no evidence, that she has been neglecting Tom since the January, 2004, judgment, takes the position that "neglect" must be interpreted in accordance with the regulations of the Department of Children and Families to mean the "failure *by a caretaker*, either deliberately or through negligence or inability, to take those actions necessary to provide a child with minimally adequate food, clothing, shelter, medical care, supervision, emotional stability and growth,

---

[14]We recognize that there may be exceptional circumstances where the determination that modification is necessary in the best interests of a child is essentially compelled.

or other essential care . . ." (emphasis in original). 110 Code Mass. Regs. § 2.00 (1996). In the mother's view, her conduct must "rise to this high level" to be sufficient to warrant the drastic measure of a change of custody. Putting to one side the facts that the mother cites to no authority in support of her position and that her memorandum in support of her motion for summary judgment makes no reference to the above quoted definition (which was in effect at the time her motion was heard),[15] we reject such a restrictive view of "neglect" in custody modification actions. As stated in the American Law Institute's (ALI) Principles of the Law of Family Dissolution, the changed-circumstances test "does [not] require circumstances as severe as those that require the state to intervene under its abuse and neglect statutes. There are circumstances that might justify a parent in obtaining an alteration in his or her child's custodial arrangement that would not otherwise justify interference by the state." ALI, Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.15 comment c (2002).[16]

Viewing the evidence in the light most favorable to the father, it reasonably can be inferred from Dr. Cavallero's reports and Dr. Grey's letter of October 21, 2004, that although the mother has engaged in some activities with Tom and has ensured that he is seeing a therapist, Tom's emotional needs are not being adequately met in the mother's household as he is largely ignored there. Such evidence includes (1) Tom's report to Dr. Cavallero that he does not "do much" with his mother, his suggestion to Dr. Grey that the attention paid to Molly "shortchanges him," and his repeated requests (discussed more fully, *infra*) that he be allowed to live with his father; (2) Dr. Grey's observations that the mother's household seems to be set up around Molly's needs more than Tom's and that the mother is invested primarily in

---

[15]The judge made no reference to the definition in his memorandum of decision. Moreover, in his memorandum, the judge characterizes the father's complaint as containing an allegation that the mother "ignores" Tom, which suggests that he did not adhere to such a strict definition. We note that at the hearing on the motion for summary judgment, the father took the position that the mother's "lack of attention [to Tom] is a form of neglect."

[16]In all events, as we shall discuss, the father submitted evidence that calls into question whether the mother is providing the child with minimally adequate emotional stability.

activities with Molly that draw Tom from his peers; and (3) Dr. Cavallero's statements that Tom's needs are not the priority and "frequently come second to the needs of [Molly] and [the mother]."[17] Moreover, Dr. Cavallero stated specifically that Tom is somewhat lonely in the mother's household and Dr. Grey voiced his concern about the child being "more than just unhappy" and "at risk to becoming clinically depressed."[18] Such evidence is, of course, contrary to the mother's statements and evidence that the

[17]We do not find persuasive the mother's argument that the statements of Dr. Cavallero and Dr. Grey on which the father relies to support his claim of "neglect" are insufficient as matter of law to defeat summary judgment as they are conclusory and speculative. See *O'Rourke* v. *Hunter*, 446 Mass. 814, 821 (2006). As we have indicated, both professionals had the opportunity to speak with and observe Tom and other family members. Moreover, it may fairly be inferred from the statements of Dr. Cavallero and Dr. Grey (again, viewed in the light most favorable to the father) that whatever limited free time the mother has with respect to the children is directed primarily toward Molly's needs and activities (including her equestrian endeavors). To the extent the mother also asserts that the statements and opinions of Dr. Cavallero and Dr. Grey are inadmissible (and thus not sufficient to create an issue of fact regarding her conduct toward Tom) as they have not been shown to be reliable under the "*Daubert/Lanigan* standard," see *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Commonwealth* v. *Lanigan*, 419 Mass. 15, 25-26 (1994), we disagree. Even were we to assume that the *Daubert/ Lanigan* standard may have application in a case such as the one presently before us, the mother points to nothing in the record to suggest that she formally made a *Lanigan* challenge to the statements of the professionals, and indeed, both parties have relied heavily in their summary judgment materials on the guardian ad litem's reports. See *Molly A.* v. *Commissioner of the Dept. of Mental Retardation*, 69 Mass. App. Ct. 267, 284-285 n.24 (2007); *Driscoll* v. *Providence Mut. Fire Ins. Co.*, 69 Mass. App. Ct. 341, 342 n.3 (2007). In all events, the thrust of the mother's argument is that there simply is no showing on the record to ascertain the basis for the professionals' opinions, a point we reject.

[18]The mother asserts that any sadness or loneliness experienced by Tom is the result of interparental conflict and litigation that has existed even prior to the divorce. This assertion ignores certain of Dr. Grey's statements that appear to link Tom's unhappiness (at least in part) to the attention paid to Molly and the evidence pointing to the secondary position to which Tom has been relegated in the mother's household. At a minimum, the mother's assertion creates factual issues that warrant further exploration. Cf. *Kernan* v. *Morse*, 69 Mass. App. Ct. at 384 n.12. Similarly, the mother's assertion that the judge was not required to rely on Dr. Grey's "opinion," as adopted by Dr. Cavallero, concerning Tom's mental health because his information was "stale," and that Dr. Wolf's statements (i.e., that Tom is upbeat and not depressed) "present[] a more accurate picture of [Tom's] condition and relationships," involve factual determinations and the weighing of evidence.

child is doing well in her household, that his needs are being met, and that he is not neglected.

Further evidence bearing on the issue of "neglect" and its impact on the child's emotional health may be found in the child's repeated and, apparently, more urgent requests that he be allowed to live with the father. While a child's expression of custodial preference must be treated with caution and the preference of an eleven year old child is not given decisive weight,[19] it is a factor to be considered by the court in the context of all other circumstances. See *Custody of Vaughn*, 422 Mass. 590, 599 n.11 (1996); *Hale* v. *Hale*, 12 Mass. App. Ct. 812, 820 (1981); *Ardizoni* v. *Raymond*, 40 Mass. App. Ct. at 738-739; *Abbott* v. *Virusso*, 68 Mass. App. Ct. 326, 337-338 (2007), *S.C.*, 450 Mass. 1031 (2008). See also ALI, Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.16 comment e ("In a majority of jurisdictions that require a showing of changed circumstances before a custody order may be modified, a child's wish for a custody change ordinarily will not, in itself, constitute a sufficient change of circumstances[;] . . . [i]n combination with other factors, however, a child's preference often appears to make a difference"); 2 Atkinson, Modern Child Custody Practice § 10.1 (2007) (while holdings of some courts that child's preference to live with noncustodial parent is not, by itself, sufficient basis to modify custody, "the practical meaning of the holding is that a child's preference is often not enough to modify custody if the child gives no reason for the preference or if the reason given is not a good one").

The mother also argues that the father did not sustain his "burden to show that the 'changed circumstances' did not exist prior to the most recent judgment." More specifically, she states that the father cannot "show, and there is no evidence on the record to demonstrate, that [she] behaved any differently toward [Tom] before the January 30, 2004, judgment than she did

---

[19]The father argues that the judge's finding that the child was ten years old when he expressed his preference to live with the father is clearly erroneous. Rather, he states, the child was eleven when the guardian ad litem filed her report and "nearly 12" when the judge rendered his decision. In the father's view, the child's age reflects upon his maturity to make an informed statement of preference. In view of the decision we reach, we find it unnecessary to address this question.

afterwards."[20] The mother also notes, correctly, that Tom expressed a preference to reside with the father before the divorce (although she acknowledges that "according to the father, the frequency of, and the manner in which such statements were made increased thereafter").

As a threshold matter, the summary judgment materials are sketchy as to the mother's possible inattention toward Tom prior to the divorce and the then effect (if any) of such conduct upon the child. At all events, there was evidence in the present case in (at least) the form of Tom's complaints subsequent to the divorce concerning the mother's conduct toward him; Tom's increasing insistence that he be allowed to live with his father, see *Basden* v. *Cole*, 123 P.3d 566, 569-570 (Wyo. 2005) (although child had expressed preference to live with mother prior to divorce, in determining whether there has been change in circumstances in custody modification action judge properly may consider with other factors child's more urgent expressions of preference to live with mother subsequent to divorce); the statements of Dr. Cavallero and Dr. Grey that Tom's needs are not a priority in the mother's household; and Dr. Grey's concerns about Tom being "more than just unhappy" and "at risk to becoming clinically depressed" (see note 18, *supra*) which, when viewed in the light most favorable to the father, could support a finding of a material change in circumstances.[21] Cf. *Freedman* v. *Freedman*, 49 Mass. App. Ct. 519, 522-523 (2000) (if alternating custody arrangement is not operating in best interests of child, Probate and Family Court has power to reexamine arrangement "as an adverse effect on the child would constitute a material change in circumstances"); *Hernandez* v. *Branciforte*, 55 Mass. App. Ct. 212,

---

[20]The mother points, for example, to the father's report to Dr. Cavallero that the mother was self-centered and desirous of material things during the marriage and the former nanny's report to the guardian ad litem that the mother tended to go shopping and pay more attention to Molly's interests during the marriage while Tom was put on the "back burner." It is apparently the mother's position that even accepting that she has ignored or neglected Tom somewhat since the divorce, such conduct cannot constitute a material change in circumstances as it is consistent with her treatment of Tom prior to the divorce. Putting to one side any possible incongruity in the mother's position, her argument fails for the reasons discussed *infra*.

[21]We do not, of course, intimate that a transfer of custody is ultimately required in the present case.

220 (2002) (upholding transfer in custody where probate judge, in determining whether there had been material change in circumstances, concluded, inter alia, that mother's performance as custodial parent demonstrated that she was not able to separate her needs and interests from those of child). But compare *Fuller* v. *Fuller*, 2 Mass. App. Ct. 372, 377 (1974) (where there was no evidence that custodial parent had, in any respect, been inadequate parent); *Delmolino* v. *Nance*, 14 Mass. App. Ct. 209, 213-214 (1982).

7. *Conclusion.* The judgment dismissing the husband's complaint for modification is vacated and the matter is remanded to the Probate and Family Court for further proceedings. The mother's request for appellate attorney's fees is denied.

*So ordered.*