NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-108                                        Appeals Court

K.A.  vs.  T.R.[1]


No. 13-P-108.

Norfolk.     April 9, 2014. - October 31, 2014.

Present:  Vuono, Meade, & Carhart, JJ.


Parent and Child, Custody.  Divorce and Separation, Child
    custody, Findings.  Evidence, Child custody proceeding.
    Probate Court, Custody of child.  Practice, Civil,
    Contempt.



    Complaint for divorce filed in the Norfolk Division of the
Probate and Family Court Department on April 16, 2010.

    The case was heard by John D. Casey, J.


    Michael J. Traft for the mother.


    VUONO, J.  Cases concerning the custody of children are

often difficult and emotionally charged, and may be rendered

even more complex when domestic violence is involved.  This

appeal presents us with such a case.

_____

    [1] We use fictitious initials for the parties.  See T.M. v.
L.H., 50 Mass. App. Ct. 856, 856 n.1 (2001).

Following a five-day trial on a complaint for divorce filed by K.A. (the former husband; hereinafter, the father), a Probate and Family Court judge concluded that although the father had engaged in a pattern of abuse towards T.R. (the former wife; hereinafter, the mother) within the meaning of G. L. c. 208, § 31A, it was in the best interests of the parties' children that their primary physical custody be with the father, with substantial parenting time for the mother. The mother has appealed from the custody orders in the amended judgment of divorce.[2] She also has appealed from those provisions of the amended judgment that adjudicated her complaints for contempt. While we are sensitive and sympathetic to the mother's position, for the reasons that follow, we affirm the amended judgment.

1. Procedural history. We recite the lengthy procedural history in detail as it informs our discussion of the issues. On April 16, 2010, the father filed a complaint for divorce and, claiming that the parties' two minor children were at risk, an ex parte motion, supported by affidavit, requesting that the mother be required to vacate the marital home and that he be given temporary legal and physical custody of the children. The motion was allowed, and a temporary order granted the father the relief he requested. Shortly thereafter, the parties entered into a stipulation, incorporated in a court order, in which they

---

[2] Other aspects of the divorce action are not in issue.

agreed to joint legal and physical custody of the children, and that the mother was to have sole and exclusive use of the marital home.

A guardian ad litem (GAL) subsequently was appointed to investigate and to report on the custody of the children, and to supply recommendations.  The GAL filed a comprehensive report on November 18, 2010.

Following the entry of additional orders, the mother filed complaints for contempt against the father on July 23, 2010, September 23, 2010, and January 13, 2011, alleging that the father had failed to comply with certain provisions of the court orders.

The trial of the father's complaint for divorce (which centered largely on the custody of the children) and the mother's complaints for contempt was held on various days between May 31, 2011, and August 24, 2011.  Following trial, but before the entry of judgment, the parties filed numerous pleadings and motions, including the father's emergency motion for temporary physical custody of the children.  That motion resulted in an order extending on an emergency basis the father's parenting time with the children.

By a judgment of divorce dated June 22, 2012, the father was designated the primary care parent of the children and, as we shall discuss more fully infra, the mother was given

substantial parenting time.  The parties were to share legal custody of the children.  The father was ordered to pay alimony to the mother, and the mother was directed to pay child support to the father.

The father was adjudged not guilty of contempt with respect to the mother's complaints filed July 23, 2010, and September 23, 2010, the judge noting that the mother had failed to sustain her burden of proof.  Although the father was adjudged not guilty on the mother's complaint for contempt filed January 13, 2011, he was ordered to make a specified payment to the mother.

2.  The judge's findings.  We summarize the judge's extensive findings and, where appropriate, make reference to evidence adduced at trial.[3]

The parties were married in May, 1997, and last lived together in April, 2010.  Two children, a son and a daughter, were born of the union.  At the time of trial, the parties' son was thirteen years old and their daughter was ten years old.

The father long has worked as a police officer, most recently in a town near Boston.  The mother, at the time of

---

[3] In his findings of fact, the judge stated that "[d]ue to the large volume of pleadings that were filed after the conclusion of the trial, the Court has included them in the procedural history, when possible."  However, the judge stated that in making his findings of fact and ordering judgment, he did not consider the information contained in any pleadings filed after the last day of trial.  The judge noted that the father had been the primary caretaker of the children since October, 2011.

trial was working part time as a lunch room attendant in a public school system. Both parties are in their forties. During the marriage (until April of 2010), the mother was the primary homemaker and caretaker of the children. As such, she attended all of the children's medical and dental appointments, extracurricular activities, and educational meetings. The father was the primary financial provider for the family. Although the demands of his work schedule (the father generally worked overnight shifts as well as extra details) did not permit him to attend many of the children's extracurricular and school-related activities, the father maintained a close relationship with the children.

The parties owned a home during the marriage and maintained a lower middle class station. During the marriage, the parties experienced financial difficulties that caused them to borrow funds on their credit cards and resulted in their repeatedly making late payments on their bills and receiving shut-off notices from utility companies. The judge found that the parties' financial difficulties were one of the main causes of their marital problems and often led to arguments between them. In addition, the father's work schedule, which limited the amount of time he could spend with the family, and the mother's assumption of nearly all aspects of the children's care,

contributed to the significant stress experienced by the parties.

At trial, the mother testified to numerous incidents of domestic violence perpetrated by the father against her between May, 1997 (during the parties' honeymoon), and November, 2009.[4] The incidents often took place during heated arguments between the parties, at least some of which arose from the parties' financial situation. While the judge did not find the mother credible concerning some of the alleged incidents of abuse, he found credible her general testimony about being physically abused by the father on multiple occasions during arguments.[5] The judge also credited the testimony of the GAL that the mother had been the victim of domestic violence by the father.[6]

---

[4] At one point in 2003, the parties separated.

[5] The judge found that the physical force used by the father against the mother included, but was not limited to, pushing, restraining, slapping and grabbing her, and forcing his way past her. In addition, the father often either threw or broke an item during the course of arguments. The judge found specifically that the father never punched the mother with a closed fist.

The judge also found that the mother "verbally abused" the father "on several occasions and hit him during at least one of their heated disputes."

[6] The GAL, an attorney and a former social worker, was described by the judge as an "experienced and qualified expert in her field . . . [who] has a thorough understanding of the law as it relates to family matters and domestic violence."

Typically, following a heated argument between the parties, the father would leave the marital home and "retreat" to his parents' home for days or weeks at a time, resulting in his having no contact with the mother or the children. The mother did not report the incidents of domestic violence to the police (and requested that her family not report said incidents) because she did not want the father to lose his job as a police officer. At times, the parties' children witnessed the domestic violence between the parties. There was no evidence that the father ever was verbally abusive or physically violent towards the children.

Beginning in the winter of 2009-2010, the children experienced a change in their relationship with the mother (and with members of her family), a relationship, the judge found, that certain witnesses had described as having been loving and respectful. The father and the mother also began to disagree over the mother's parenting of the children. Indeed, the judge found that the father testified credibly that by December, 2009, he had become so concerned about the "abusive manner" in which the mother was treating the children that he instructed the children to wake him up if they had an argument with the mother.[7]

---

[7] This was not the first time the father had concerns with respect to the mother's treatment of the children. The judge credited the father's testimony that when the parties' son was

The children, in fact, began to seek solace in the father by waking him up when they had disagreements with the mother.

By early 2010, the children appeared defiant and disrespectful of the mother, and the mother had difficulty controlling and disciplining them.[8] There were arguments during which the mother became physical with the children and, on one occasion, a child physically attacked the mother. The parties separated in April, 2010.

At trial, the mother's expert, a clinical and forensic psychologist who holds a Ph.D, testified concerning domestic violence and the "brainwashing" of the children by the father.[9] The "red flags" for brainwashing, in the mother's expert's view,

---

in the third grade, the father was concerned about statements by the mother to the son that undermined the son's self-esteem.

[8] The judge found that the mother had been prescribed antidepressant medication, but that she did not take the medication. The judge found that the mother was experiencing mental health problems that, he stated, could explain why she was struggling to discipline the children prior to the parties' separation.

[9] The mother's expert testified to her substantial experience in domestic violence cases, and stated, among other things, that the main component of domestic violence was "coercive control" by the perpetrator. She also testified regarding the concept of brainwashing, a general term describing acts by a perpetrator to undermine the children's relationship with the other parent (including denigrating the other parent). The expert stated that in a family "where there's been domestic violence, [the children] may well feel that it's a lot safer to take total sides with the perpetrator, because the perpetrator is going to use the same kind of techniques on [the children] that they have [on] the other parent."

included the sudden change in the children's behavior and their hostile and disrespectful treatment of the mother during the winter of 2010. The mother's expert recommended that the mother have sole legal and physical custody of the children[10] and that the father, initially, be given supervised parenting time with the children.

Pointing to certain evidence at trial, including the report and the testimony of the GAL, the judge rejected the opinion of the mother's expert, finding that there was no credible evidence that the children's disobedience of and alienation from the mother was caused by the father.[11] To the contrary, the judge

---

[10] With respect to physical custody, the mother's expert testified at one point that she did not think that "the perpetrator [of domestic violence] should ever have physical custody."

[11] The judge found that there was credible evidence presented at trial that directly contravened the mother's expert's assessment concerning brainwashing. Among other things, the judge credited the GAL's report where it provided that "[b]oth of the children's therapists are confused by the children's extreme alienation from [the mother], and neither can point to anything the children say that [the father] has said or done, or anything that they as therapists have seen [the father] say or do, that would create or perpetuate this alienation." The judge also credited the GAL's testimony that she believed the father had not intentionally alienated the children from the mother and that the children have not been coerced or coached by the father.

The judge found further that unlike the GAL, who was an "impartial witness" whom the parties mutually had selected, and who had interviewed the father, the mother, and the children on multiple occasions as well as the children's teachers and other collaterals, the mother's expert interviewed only the mother,

found that the father supported the mother, instructed the children to behave and obey the mother, and did not undermine the mother's role as a parent.

3.  The law.  "The best interests of a child is the overarching principle that governs custody disputes in the Commonwealth."  Charara v. Yatim, 78 Mass. App. Ct. 325, 334 (2010).  See Loebel v. Loebel, 77 Mass. App. Ct. 740, 747 (2010).  Generally, "[w]hat is in a child's best interest depends upon the particular needs of the child, and is left largely to the discretion of the judge, who 'may consider any factor pertinent to those interests.'"  Charara v. Yatim, supra, quoting from Houston v. Houston, 64 Mass. App. Ct. 529, 535 (2005).  See El Chaar v. Chehab, 78 Mass. App. Ct. 501, 506 (2010) (referencing "constants," or factors, often considered by judge in determining best interests of child).  "A custody determination requires a 'realistic, commonsense judgment,' which takes account of the fact that the 'determination of custody is a choice among limited alternatives, all of which,

reviewed the GAL report, and listened to the trial testimony. The judge found that the mother's expert's recommendations concerning custody "contain[ed] limitations" and that he (the judge) placed "greater emphasis" on the GAL's testimony and the GAL's report with respect to custody.  (The GAL recommended that the parties have shared legal and physical custody of the children, and that if that did not work, then the father should have physical custody of the children.)  The judge also found that much of the mother's expert's testimony was not credible because he did not find factual support in the foundation of her opinion.

invariably, have imperfections' and evaluates them in light of the 'well-being of the child[ren] and [their] future development.'"  Murphy v. Murphy, 82 Mass. App. Ct. 186, 193 (2012), quoting from B.B.V. v. B.S.V., 68 Mass. App. Ct. 12, 18 (2006).

When domestic violence is involved, however, the Legislature has determined that a particular analysis must be followed.[12]  General Laws c. 208, § 31A, inserted by St. 1998, c. 179, § 3, requires the judge to "consider evidence of past or present abuse toward a parent or child as a factor contrary to the best interest of the child" when issuing any temporary or permanent custody order.  See Maalouf v. Saliba, 54 Mass. App. Ct. 547, 549 (2002); Care & Protection of Lillith, 61 Mass. App. Ct. 132, 142 (2004).  A finding by a preponderance of the evidence that "a pattern or serious incident of abuse has occurred shall create a rebuttable presumption that it is not in the best interests of the child to be placed in sole custody, shared legal custody or shared physical custody with the abusive parent."  G. L. c. 208, § 31A.  "Such presumption may be

---

[12] The peculiar harm suffered by those who experience, or witness, domestic abuse is discussed in Custody of Vaughn, 422 Mass. 590, 595-596 (1996), and Opinion of the Justices, 427 Mass. 1201, 1203 (1998), as well as Sher v. Desmond, 70 Mass. App. Ct. 270, 280 n.12 (2007).  The seriousness with which our society views domestic violence also is reflected in our statutory law, including the recent "Act relative to domestic violence."  St. 2014, c. 260.

rebutted by a preponderance of the evidence that such custody award is in the best interests of the child." Ibid. Section 31A further provides:  "If the court finds that a pattern or serious incident of abuse has occurred and issues a temporary or permanent custody order, the court shall within 90 days enter written findings of fact as to the effects of the abuse on the child,[13] which findings demonstrate that such order is in the furtherance of the child's best interests and provides for the safety and well-being of the child."[14]  Ibid.

_____

[13] The effects of abuse on the child include, but are not limited to, "the child is afraid of the abusive parent; the child is having problems with his or her performance at school; the child has exhibited regressive behavior; the child has problems with peer or family relationships; the child has been experiencing nightmares and sleep disturbances; the child has frightening memories from witnessing the abuse, the child exhibited extreme distress at the time of the incident from witnessing the abuse; or, the child has exhibited hostile or aggressive behavior toward others."  Commentary to § 12:05A of the Guidelines for Judicial Practice:  Abuse Prevention Proceedings (2014).  These same effects are listed in Probate and Family Court Form CJ-D 121 (2000), entitled "Findings Relating to the Issuance of a Custody Order to the Abusive Parent."  Additional examples of possible findings regarding the effect on a child of the abuse of a parent are discussed in Quirion, Increased Protection for Children From Violent Homes, 16 Mass. Fam. L.J. 67, 73 (1998). See Maalouf v. Saliba, 54 Mass. App. Ct. at 550-551.

[14] The Commentary to § 12:05A of the Guidelines for Judicial Practice:  Abuse Prevention Proceedings (2014), further provides:  "There will be instances, however, when the child has been impacted by the pattern or serious incident of abuse, but notwithstanding these effects, the best interest and the safety and well being of the child necessitate that the court grant custody to the abusive parent.  Some of these instances include: the child poses a threat to the safety of the non-abusive parent

4.  The custody orders and rationale.  Having found that there was a pattern of abuse by the father against the mother within the meaning of G. L. c. 208, § 31A, giving rise to the statutory presumption, the judge nonetheless concluded that the father had rebutted the presumption that it was not in the children's best interests to be in his primary physical custody. In arriving at his decision, the judge considered, among other things, the children's antagonism toward, and alienation from, the mother; the mother's inability to control or discipline the children; the potential for violence between the mother and the children if the mother were to have primary physical custody of the children; and the children's feelings of safety when they were with the father.[15]

_____

or the other children in the household of the non-abusive parent; the non-abusive parent's parenting ability is compromised such that the child is presently at risk of danger in his or her care; the child demonstrates a substantial emotional connection to the abusive parent; or custody to the non-abusive parent currently poses a serious risk to the child's psychological development."  The foregoing instances are set out substantially in Probate and Family Court Form CJ-D 121 (2000).

[15] On these points, the judge often credited and quoted from portions of the GAL's report and her testimony.  See J.S. v. C.C., 454 Mass. 652, 654-655 (2009); Pizzino v. Miller, 67 Mass. App. Ct. 865, 875-876 (2006).  See also Gilmore v. Gilmore, 369 Mass. 598, 604-605 (1976).  Among other things, the judge found that the parties' son had reported to the GAL that when he was with the father he felt "100% safer" than when he was with the mother because the mother could get "mad" or "out of control" at "any minute."  The judge noted the statement of the GAL that the children were calmer with the father and, as a result, could "focus their energy more productively on academic/social/

The judge placed significant emphasis on the GAL's testimony regarding her concern that if the children were placed primarily with the mother, the parties' daughter could physically attack the mother or run away from home, and the parties' son, who was in an emotionally vulnerable state, could commit suicide. The judge also credited the GAL's report where it provided that "[n]ow that the parties are separated the issue of physical abuse between the parties going forward becomes less of an issue."

In addition, the judge considered the children's positive relationship with the father (and their lack of behavioral issues when they were with him), the children's consistent statements of preference to live with the father, and the changes the father had made in his lifestyle, including changing his work shift from night to day.

---

emotional pursuits." The judge also credited the GAL to the extent she stated that the children are at risk with the mother "not because she will hurt them, but rather [because] she and the children will get into an argument that will escalate and turn physical. There have been incidents such as this in the past." In addition, the judge credited the GAL when she wrote in her report: "In the event a shared physical custody arrangement does not work, and [the mother] is unable to control the children for whatever reason, the children and [the mother] would be at risk if [the father] were not the primary custodian. This is not a 'victory' for [the father] or a denial of the abuse, physical and emotional, that was a part of the [parties'] marriage, it is simply a statement that the children and [the mother] cannot be exposed to escalating physical events if [the mother] cannot control the children. This result would be the worst outcome for this family."

The judge also credited the GAL report when it provided that the "parenting arrangements going forward cannot be about punishment for past behavior" but must look to what is best for the children, including the children's safety.[16]  In achieving that goal, the judge, as we have stated, found that it was in the best interests of the children to be in the primary physical custody of the father, with substantial parenting time for the mother.

5.  Discussion.  The mother argues generally that the judge's determination that the father had overcome the presumption against primary physical custody with him was not supported by adequate findings or the evidence.  We turn first to the mother's claim that the judge failed to make findings, as required by G. L. c. 208, § 31A, see Custody of Vaughn, 422 Mass. 590, 599-600 (1996), concerning the effects of the father's abuse of the mother, on the children.[17]

---

[16] The judge elaborated further, crediting so much of the GAL report as provided:  "Presently [the son] and [the daughter] reject [the mother] and want to live with [the father].  It is not clear how the children came to this place, but this is where they are.  The arrangements that are made need to recognize the children's current needs, not the needs of [the mother], who has been the children's primary parent up until April, 2010, or [the father], who is now actively involved with the children's lives."

[17] We note that several of the incidents of abuse described by the mother at trial took place before the births of the children.

Here, the judge was cognizant of, and made reference in his findings to, the significant impact of domestic violence on its victims and the children who may be exposed to it. The judge also made findings that reflect the effects of the abuse on an individual level. Specifically, the judge found that after an incident of domestic violence in the spring of 2006, the parties' son reported to a school adjustment counselor that he had heard his parents arguing and was concerned for his mother's safety. The judge also noted the mother's testimony that after the son's pediatrician appeared concerned about the son's "sadness," the mother reported the parties' domestic violence to the pediatrician. In addition, the judge found that as a result of the parties' heated (and, at times, violent) confrontations, the father left the marital home for days or weeks at a time, during which periods he had no contact with the children. The judge also found that both children had been in therapy and that they would continue to require therapy "arising out of the conduct of the parties during the marriage." Such conduct clearly would include the father's abusive actions to which the children were exposed. We perceive no reason to disturb the custodial orders for the reason of a lack of findings of the effects of the abuse.

The mother argues next that a "perpetrator who refuses to acknowledge any fault cannot overcome the presumption against an

award of primary custody simply because the minor children express a preference."  We think the mother reads too narrowly the judge's findings and rationale.  As we have indicated supra, this is not a case in which the judge awarded custody to the father simply because of preferences expressed by the children. To the contrary, the children's preferences were one of many factors considered by the judge, and he stated specifically that the children's preferences were not decisive.  See J.F. v. J.F., 72 Mass. App. Ct. 782, 795 (2008).  To the extent the mother also suggests that the children's preferences may not reflect their true feelings, but rather are the product of the father's control over the children, the judge found that there was no credible evidence that the father coached the children to express their desire to live with him.  The judge also credited the testimony of the GAL that she believed that the children's "feelings of not being safe with [the mother] came from the children."[18]

---

[18] While the father testified that he could not recall being physical with the mother on numerous occasions, he admitted, as the judge found, to "being physical" with her on several occasions.  The mother also points to statements made by the father in a so-called "affidavit" filed in this court that, the mother states, indicate that the father continues to deflect responsibility for his conduct during the marriage.  There is doubt whether the father's affidavit is properly before us.  In any event, the statements the mother references were not before the trial judge and we need not consider them.

The mother argues, in addition, that the judge's findings that the domestic violence essentially had ended when the parties' separated and was not likely to pose an issue in the future, represent a fundamental misunderstanding of the nature of domestic violence and, based on the evidence, are clearly erroneous. More specifically, the mother asserts that domestic violence involves not simply physical assault but, in its essence, constitutes an assertion of control and dominance over the abused party. The mother states that when a domestic partner is deprived of the opportunity to inflict physical coercion safely behind closed doors, he may look to other ways to exert influence, such as manipulation of the children to support the perpetrator's agenda (e.g., here, the removal of the mother's role in the family). Continuing, the mother asserts that, "[r]elated to this misunderstanding" by the judge is his rejection of her expert's conclusion that the "children had been influenced by their experience of violence to support [the father's] perspective and denigrate [the mother]." In the mother's view, the judge's custody orders reward the father for his negative and destructive behavior and "allow a perpetrator of domestic violence to have his way."

At the outset, we agree with the mother's assertion that domestic violence may continue after the parties' separation and we acknowledge that the judge's findings that future violence

between the parties "is not an ongoing concern" (or is "less of an issue") because the parties no longer live together appear to minimize the risk of violence following a separation. However, viewed in context, we believe that the judge was attempting to emphasize the fact that there had been no physical violence between the parties after their separation. The judge quoted, for example, statements in the GAL report that there had been no "actual or threatening behavior" between the parties since their separation, and that the last act of physical violence between the parties had occurred more than one year before the report was prepared. Furthermore, the judge was well aware of the mother's position concerning continuing abuse by the father, referring to the testimony of the mother's expert and quoting from the GAL's report that "[the mother] considers that [the father's] abuse of her continues because she believes him to be alienating the children from her . . . and because she believes him to be controlling, by which she means that 'everything always goes his way.'"

The problem with the mother's argument is that the judge, upon consideration of all the evidence, rejected the mother's position that the father had brainwashed, coached, or intentionally alienated the parties' children from the mother.[19]

---

[19] Contrary to the mother's suggestion, the judge did not base his findings on this point solely on statements made to the

To the contrary, the judge found specifically that the father had supported the mother's relationship with the children and did not undermine her role as a parent. Those findings are supported by the evidence, including the GAL's report and testimony. The judge was not required to accept, and did not accept, the testimony of the mother's expert to the contrary. See Ulin v. Polansky, 83 Mass. App. Ct. 303, 307-308 (2013). See also Adoption of Elena, 446 Mass. 24, 31 (2006) (judge's assessment of credibility of witnesses and weight of evidence entitled to deference).

The judge was presented with a difficult and highly contentious custody case. Ultimately, he was charged with rendering a decision that would protect the safety and the well-being of the parties' children and would be in the best interests of those children. The judge properly recognized that the present case was not about punishing a party for past bad behavior, but was about deciding what was best for the children going forward. The judge's findings and rationale for placing primary physical custody of the children with the father,

GAL by the children's therapists. (See note 11, supra.) The judge also relied on the statements and the testimony of the GAL who had interviewed the children (and others) on several occasions. Furthermore, that the therapist for one of the children reported to the GAL that she no longer would work with the child alone (but would work with the child in a family therapy setting) because the child allegedly had distorted statements made to the child by the therapist does not render the judge's findings erroneous.

notwithstanding the pattern of abuse by the father towards the mother, reflect consideration of relevant circumstances, including the potential for violence between the mother and the children, the mother's compromised parenting abilities, the children's emotional connection and feelings of safety with the father, and the potential risks to the children should the father not have primary physical custody. Indeed, the reasons set out by the judge in support of custody being with the father track closely the circumstances listed in the Commentary to § 12:05A of the Guidelines for Judicial Practice: Abuse Prevention Proceedings (2014), which may support custody to an abusive parent.

We have scrutinized closely the custody orders and perceive neither an abuse of discretion nor an error of law.

6. The contempt actions. a. The contempt action filed January 13, 2011. After the mother filed an emergency motion to access the father's deferred compensation plan to avoid foreclosure on the marital home (and to pay additional expenses), the judge found that there had been extraordinary and unforeseen circumstances beyond the parties' control that had caused them to be five months in arrears on their mortgage, which was scheduled for foreclosure in October, 2010. The judge ordered that the father "shall request that the sum of $25,000.00 [so long as that amount does not exceed fifty percent

of his vested balance] be withdrawn from his [deferred compensation plan] in order to avoid a foreclosure on the marital home." The sum was to be considered a distribution against the mother's G. L. c. 208, § 34, interest in the plan.

On January 13, 2011, the mother filed a complaint for contempt alleging that the father had violated the court order by requesting that his entire deferred compensation account be liquidated (i.e., by requesting more than $25,000). The mother further alleged that in November, 2010, the father violated the order by remitting the sum of $20,135.18 to her, and retaining the balance of the funds in the amount of $29,013.22.

The judge found that the father had liquidated the entire available balance of the deferred compensation account (i.e., $49,148.40, after the withholding of Federal taxes in the amount of $5,802.64 and State taxes in the amount of $3,075.40). Of this amount, the mother received $20,135.18, but, the judge stated, if the mother were to receive half of the net proceeds, she would have received $24,574.20. The judge found that the father withheld $4,439.02 from the mother and gave it to his parents to hold in escrow.[20] Continuing, the judge stated that the court order provided that the father was to pay up to $25,000 to the mother if it were available. But the judge found

---

[20] The father testified that he withheld this amount in the event there were any additional taxes.

that the mother used the monies received to repay family loans and household expenses, despite noting in her emergency motion that the funds were to be used to pay the mortgage arrears.[21] The father used "his portion" of the liquidated proceeds, in large part, to pay off significant marital debt. The judge concluded that the father was not guilty of contempt, but ordered him to pay to the mother $4,439, less fifty percent of any additional Federal or State penalties or taxes that exceeded the earlier withholdings.

"[A] civil contempt finding [must] be supported by clear and convincing evidence of disobedience of a clear and unequivocal command." Birchall, petitioner, 454 Mass. 837, 853 (2009). A judge's ultimate conclusion on the contempt finding is reviewed under the abuse of discretion standard. See Halpern v. Rabb, 75 Mass. App. Ct. 331, 334 n.6 & 336 (2009); Freidus v. Hartwell, 80 Mass. App. Ct. 496, 504 (2011).

Contrary to the mother's assertion, we cannot say on the evidence and findings that the judge abused his discretion in determining that the father was not in contempt.

b. The contempt actions filed July 23, 2010, and September 23, 2010. The mother's terse and conclusory assertions concerning the contempt actions filed July 23, 2010, and

---

[21] The mother acknowledged at trial that the deferred compensation funds received by her were not used to pay the mortgage arrears.

September 23, 2010, do not rise to the level of reasoned appellate argument as contemplated by Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), and we do not consider them.  See Adams v. Adams, 459 Mass. 361, 392 (2011); Poras v. Pauling, 70 Mass. App. Ct. 535, 546 (2007).

                    Amended judgment of divorce
                         affirmed.